RAMAH NAVAJO CHAPTER,
Plaintiff–Appellant,

v.

Manuel LUJAN, individually and as Secretary of the Interior; Eddie Brown, individually and as Assistant Secretary of the Interior; Marvin Pierce, individually and as Chief of Office of Inspector General, U.S. Department of the Interior; United States of America, Defendants–Appellees,

Mississippi Band of Choctaw Indians, Amicus Curiae.

No. 94–2253.

United States Court of Appeals, Tenth Circuit.

May 8, 1997.

**1456**

Michael P. Gross, of Roth, VanAmberg, Gross, Rogers & Ortiz, of Santa Fe, New Mexico, for appellant.

Jeffrica Jenkins Lee (Barbara C. Biddle with her on the brief), of the Department of Justice, Washington, D.C., for appellees.

Hans Walker, Jr., and Marsha Kostura, of Hobbs, Straus, Dean & Walker, Washington, D.C., for amicus curiae.

Before ANDERSON, HENRY, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiff Ramah Navajo Chapter, a sanctioned tribal organization of the Navajo Nation, filed this action seeking money damages, as well as injunctive and declaratory relief, from defendants for alleged violations of funding provisions in the Indian Self–Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* The district court granted summary judgment in favor of defendants and plaintiff appeals. We reverse and remand for further proceedings.

### I.

### Indian Self–Determination and Education Assistance Act

■ The Indian Self–Determination and Education Assistance Act (the Act), Pub.L. No. 93–638, 88 Stat. 2203 (codified at 25 U.S.C. §§ 450–450n) (1988 & Supp. V 1993), was signed into law by President Ford on January 4, 1975. The Act authorizes tribes to contract with the Secretary of the Department of the Interior and the Secretary of the Department of Health and Human Services to administer previously authorized programs otherwise directly administered by those departments. More specifically, under the Act, the Secretaries continue to provide direct services to a tribe until such time as the tribe chooses to enter into a "self-determination contract" to operate those services. At that point, the Secretaries are required to transfer resources and control of those programs to the tribe. The Act was intended to assure maximum participation by tribes in the planning and administration of federal

services, programs, and activities for Indian communities.

## Payment of indirect costs under the Act

In November 1975, the Secretary of the Interior promulgated regulations concerning funding for direct and indirect costs under self-determination contracts. In particular, the Secretary promulgated 25 C.F.R. § 271.54, which provides in pertinent part that a tribe "shall be entitled to be funded for direct and indirect costs under [a self-determination] contract," as provided in 25 C.F.R. Part 276, Appendix A. 25 C.F.R. § 271.54(f). In turn, Part 276, Appendix A, incorporates the provisions of Office of Management and Budget Circular A–87, which sets forth general principles for determining the allowability of direct and indirect costs under government contracts. Appendix A, pt. F, defines "indirect costs" as "those (a) incurred for a common or joint purpose benefiting more than one cost objective, and (b) not readily assignable to the cost objectives specifically benefited, without effort disproportionate to the results achieved." Appendix A, pt. F(2), further provides with respect to reimbursement of indirect costs:

> In lieu of determining the actual amount of grantee departmental indirect cost allocable to a grant program, the following methods may be used:
>
> a. Predetermined fixed rates for indirect costs. A predetermined fixed rate for computing indirect costs applicable to a grant may be negotiated annually in situations where the cost experience and other pertinent facts available are deemed sufficient to enable the contracting parties to reach an informed judgment (1) as to the probable level of indirect costs in the grantee department during the period to be covered by the negotiated rate, and (2)

that the amount allowable under the predetermined rate would not exceed actual indirect cost.

Although Appendix A does not set forth a specific method for determining a "predetermined fixed rate" for indirect costs, the Secretary of the Interior apparently implemented an internal policy or formula for doing so.[1] Under this formula, the Secretary adds all funds that will be received by a tribe in a given fiscal year, including those not received in connection with a self-determination contract, into the denominator. The numerator is the amount of indirect costs the tribe is expected to incur in a given fiscal year. The numerator is divided by the denominator, resulting in an indirect cost rate. To produce the amount of indirect cost funding that will be provided to a tribe in a given fiscal year, the Secretary then multiplies the amount of direct cost funding under the self-determination contract by the indirect cost rate.[2]

## 1988 Amendments to Act

In 1988, Congress amended the Act to address various problems that had arisen since its implementation, including problems involving funding of indirect costs. *See* S.Rep. No. 274, 100th Cong., 1st Sess. 2, 8–13 (1987) (outlining purpose of amendments and stating "the single most serious problem with the implementation of the Indian self-determination policy has been the failure of the Bureau of Indian Affairs and the Indian Health Service to provide funding for the indirect costs associated with self-determination contracts"). In particular, Congress added the following subsections to 25 U.S.C. § 450b, the "Definitions" section of the Act[3]:

> (g) "indirect costs" means costs incurred for a common or joint purpose benefiting more than one contract objective, or which are not readily assignable to the contract

---

1. Both parties refer to, and agree upon, the formula that is used by the Secretary for determining the indirect cost rate. However, neither party has specifically indicated whether the Secretary devised this formula, or adopted it from some other source. As best as we can determine from the record on appeal, the formula is an internal formula that is not set forth in any rule or regulation.

2. The formula can be summarized as follows:

Step 1. Indirect costs ÷ All funds received by tribe from whatever source = Indirect cost rate.

Step 2. Direct cost funding under Act × Indirect cost rate = Indirect cost funding.

3. Section 450b has since been revised and subsections (g) and (h) are now subsections (f) and (g). 25 U.S.C. § 450b(f), (g) (1995).

objectives specifically benefited without effort disproportionate to the results achieved;

(h) "indirect costs rate" means the rate arrived at through negotiation between an Indian tribe or tribal organization and the cognizant Federal agency.

In addition to these new definitional provisions, Congress added 25 U.S.C. § 450j–1, entitled "Contract funding and indirect costs," which provides in pertinent part[4]:

(a)(1) The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract.

(2) There shall be added to the amount required by paragraph (1) contract support costs which shall consist of the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—

(A) normally are not carried on by the respective Secretary in his direct operation of the program; or

(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

\* \* \*

(d)(1) Where a tribal organization's allowable indirect cost recoveries are below the level of indirect costs that the tribal organizations should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, State, or other agency, such shortfall in recoveries shall not form the basis for any theoretical over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such tribal organization, nor shall any agency seek to collect such shortfall from the tribal organization.

(2) Nothing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract.

Congress also amended 25 U.S.C. § 450k, entitled "Rules and regulations." In particular, Congress amended § 450k(b) to read as follows:

(1) Within three months from the date of enactment of this Act, the Secretary shall consider and formulate appropriate regulations to implement the provisions of this Act, with the participation of Indian tribes. Provided, That such proposed regulations shall contain all Federal requirements applicable to self-determination contracts and grants under this Act.

(2) Within six months from the date of enactment of this Act, the Secretary shall present the proposed regulations to the Select Committee on Indian Affairs of the United States Senate and to the Committee on Interior and Insular Affairs of the United States House of Representatives.

(3) Within seven months from the date of enactment of this Act, the Secretary shall publish proposed regulations in the Federal Register for the purpose of receiving comments from tribes and other interested parties.

(4) Within ten months from the date of enactment of this Act, the Secretary shall promulgate regulations to implement the provisions of this Act.

### The underlying facts of this case

In fiscal year 1989, plaintiff had five self-determination contracts with the Department of Interior's Bureau of Indian Affairs (BIA) covering real estate, natural resources, law enforcement, Aid to Tribal Government, and water rights programs. The direct cost funding for these five contracts totaled $755,770. Plaintiff also had two contracts with the State of New Mexico for criminal justice and juvenile offender restitution programs. The funding for these two programs, which came from the U.S. Department of Justice under

---

4. Section 450j–1 has since been amended by Congress. *See* 25 U.S.C. § 450j–1 (1995).

the Criminal Justice Assistance Act, 42 U.S.C. § 3754(b), totaled $62,927.

Plaintiff submitted an indirect costs proposal to the Department of Interior's Office of the Inspector General (OIG), the office responsible for negotiating the indirect costs rate with plaintiff and other tribes and tribal organizations under the Act. The proposal contained a suggested indirect costs pool, composed of plaintiff's anticipated general administrative expenses in conducting all of its programs ($364,021), and a direct cost base composed of direct program expenses only for the self-determination contracts with the Secretary of the Interior ($755,770). Under this proposal, plaintiff's indirect costs rate would have been 48.1% ($364,021 ÷ $755,770 = 48.1%).[5]

The OIG approved the amount of the indirect costs pool proposed by plaintiff, but disagreed with plaintiff over whether the funds plaintiff would receive from the two state programs should be included in the direct costs base in calculating the indirect costs rate. The OIG took the position that the total direct costs base should include all programs being contracted to plaintiff from all funding sources, including the two state programs, for a total direct costs base of $818,697 (five self-determination contracts totaling $755,770 + two state contracts totaling $62,927 = $818,697). The OIG therefore set the indirect costs rate at 44.5% ($364,021 ÷ $818,697 = 44.5%), and agreed to pay plaintiff approximately $336,318 in indirect costs for fiscal year 1989 ($755,770 × 44.5% = $336,317.65). This proposed figure was approximately $28,000 less than the total amount of the indirect costs pool proposed by plaintiff and approved by OIG.

Plaintiff filed a contract dispute claim with BIA's contracting officer, objecting to the OIG's inclusion of the state program funds in the direct costs base, which was denied by the BIA contracting officer on August 27, 1990. In the letter denying plaintiff's claim, the contracting officer noted: "The OIG agrees that taking account of a state grant's under-funding is contrary to Public Law 100–472 [the 1988 amendments to the Act], however, the inclusion of this under-funding by the Ramah Navajo Chapter from [fiscal year] 1987 would be shifting the cost of administering these state programs to the BIA which is contrary to [OMB Circular] A–87." R. I at 316.

**Procedural history of this case**

On October 4, 1990, plaintiff filed a class action suit against defendants in the United States District Court for the District of New Mexico pursuant to 25 U.S.C. § 450m–1(a) (1988). Plaintiff's first amended complaint, which was filed on January 2, 1991, sought compensatory damages and declaratory and injunctive relief against defendants for their alleged violation of 25 U.S.C. § 450j-1 (1988). In particular, the first amended complaint alleged that "[d]efendants' insistence that certain State and other grants ... be taken into account by including them in the direct cost base" damaged plaintiff by

> (a) decreasing the indirect cost percentage for fiscal year 1989 applied to the BIA program base, resulting in a smaller indirect cost recovery for BIA-contracted programs, and (b) failing to provide reimbursements mandated by Congress for indirect costs associated with other agencies' programs in the amount determined to be needed reflected in the indirect cost pool.

R. I at 24. Plaintiff subsequently filed a motion for certification of class action under Fed.R.Civ.P. 23, which was granted by the district court.

The parties filed cross-motions for summary judgment. In a memorandum and order issued on November 4, 1993, the district court granted summary judgment in favor of defendants. Plaintiff filed a motion for reconsideration, which was denied on February 10, 1994. Final judgment was entered in the case on October 19, 1994, and plaintiff filed its notice of appeal on November 16, 1994.

**The district court's memorandum opinion**

The district court reviewed § 450j–1(a)(2) and stated its "clear and unambiguous lan-

---

**5.** Although the actual indirect costs rate is 48.16557%, plaintiff and OIG apparently limit the rate to three digits and do not round to the nearest percent. We have found nothing in the record that discusses calculation of the indirect cost rate (*e.g.*, rounding, etc.).

guage ... indicates than when the BIA enters into a self-determination contract with a tribal organization, the Secretary must pay to the contractor the amount it would have expended to operate the contracted program plus all indirect costs." R. II at 825–26. Notwithstanding this conclusion, the court then focused on § 450j–1(d)(2) and concluded its language was also clear and unambiguous, and provided defendants were to fund only those indirect costs that were determined, under the indirect costs formula developed by the defendants, to be "associated with" the self-determination contracts. More specifically, the court concluded § 450j–1(d)(2) of the Act "mandates that the BIA only pay their share of indirect costs which are 'associated with' the self-determination contracts they enter into." R. II at 828. According to the district court, the regulations promulgated by defendants in 1975, in particular 25 C.F.R. Part 276, Appendix A, set forth the appropriate method for determining what indirect costs were "associated with" self-determination contracts. Therefore, the court concluded, "where the Secretary contracts under the Act with tribal organizations, and those tribal organizations have also contracted to provide programs with agencies other than the BIA, then indirect costs are to be allocated among the several programs," and "[t]he result is that the BIA is only required to fully fund those indirect costs determined under Appendix A as allocated to and associated with the BIA programs." R. II at 828.

## II.

**Standard of review**

We review the district court's grant of summary judgment de novo, applying the same standard as the district court under Fed.R.Civ.P. 56(c). *Universal Money Centers, v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1529 (10th Cir.), *cert. denied,* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Ap-*

*plied Genetics Intern. v. First Affiliated Securities,* 912 F.2d 1238, 1241 (10th Cir.1990). If there is no genuine issue of material fact in dispute, we must determine whether the district court correctly applied the law. *Id.*

## Do the 1988 amendments to the Act require defendants to fully fund plaintiff's indirect costs for fiscal year 1989?

■ The starting point in any case involving statutory construction is the language of the statute itself. *United States v. Thompson,* 941 F.2d 1074, 1077 (10th Cir.1991), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). "When the terms of the statute are clear and unambiguous, that language is controlling absent rare and exceptional circumstances." *Id.* (quoting *Wilson v. Stocker,* 819 F.2d 943, 948 (10th Cir.1987)).

■ As previously noted, the 1988 amendments to the Act contain two new subsections which address the extent to which defendants are to fund the indirect costs that a tribal organization incurs in carrying out a self-determination contract. The first, 25 U.S.C. § 450j–1(a)(2), provides:

There shall be added to the amount [of direct funds needed by a tribe to carry out a self-determination contract] contract support costs which shall consist of the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—

(A) normally are not carried on by the respective Secretary in his direct operation of the program; or

(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

The second, 25 U.S.C. § 450j–1(d), provides:

(1) Where a tribal organization's allowable indirect cost recoveries are below the level of indirect costs that the tribal organizations should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, State, or other agency, such shortfall in recoveries shall not form the

basis for any theoretical over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such tribal organization, nor shall any agency seek to collect such shortfall from the tribal organization.

(2) Nothing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract.

As an initial matter, we note that both parties agree the term "contract support costs," as used in § 450j–1(a)(2), is synonymous with the term "indirect costs." Reviewing the amendments and the Act as a whole, we agree and conclude "contract support costs" encompasses "indirect costs" incurred by a tribal organization in carrying out a self-determination contract.[6]

Ultimately, however, we are unable to conclude that either of the above-quoted subsections clearly and unambiguously speaks to the precise question at issue here, i.e., the extent to which indirect costs are to be funded by defendants. Neither subsection defines the terms that it uses. Subsection (a)(2) refers to "reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management," but fails to define "reasonable costs" or "activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management." Similarly, subsection (d)(2) refers to indirect costs "associated with" a self-determination contract, but fails to define "associated with." Compounding the lack of definitions is the nature of indirect costs. As the Act itself recognizes, and as the facts in the case demonstrate, indirect costs are not readily allocable to a particular grant or program, and therefore tend to be fixed rather than variable.

When faced with an ambiguous federal statute, we typically defer to the administering agency's interpretation as long as it is based on a permissible construction of the statute at issue. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *State of Utah v. Babbitt,* 53 F.3d 1145, 1148 (10th Cir.1995). In cases involving Native Americans, however, we have taken a different approach to statutory interpretation, holding that "normal rules of construction do not apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue." *E.E.O.C. v. Cherokee Nation,* 871 F.2d 937, 939 (10th Cir.1989). Instead, we have held that federal statutes are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit. *Id.; see also Montana v. Blackfeet Tribe,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403–04, 85 L.Ed.2d 753 (1985); *United States v. Thompson,* 941 F.2d 1074, 1077 (10th Cir.1991), *cert. denied* 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). This canon of statutory construction is "rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985).

The question here is which canon of statutory construction is controlling. In answering this question, we turn to the purpose of the Act at issue. As noted in the Senate Report accompanying the 1988 amendments, "[t]he Act was intended to assure maximum participation by Indian tribes in the planning and administration of federal services, programs and activities for Indian communities." S.Rep. No. 274, 100th Cong., 1st Sess. 1–2. This purpose is consistent with "[t]he federal policy of Indian self-determination [which] is

---

6. In *Andrus v. Shell Oil Co.,* 446 U.S. 657, 666, 100 S.Ct. 1932, 1938, 64 L.Ed.2d 593 (1980), the Supreme Court noted subsequent congressional actions "must be weighed with extreme care, [but] should not be rejected out of hand as a source that a court may consider in the search for legislative intent." Although we believe the 1988 amendments are sufficient to demonstrate Congress' intent, we note subsequent amendments, in particular 25 U.S.C. § 450j–1(a)(3)(A)(ii) (noting "contract support costs" include "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with" a self-determination contract), have clarified the fact that Congress intended for the term "contract support costs" to encompass "indirect costs."

premised upon the legal relationship between the United States and Indian tribal governments," and with "[t]he right of tribal self-government [which] is ... protected by the trust relationship between the Federal Government and Indian tribes." *Id.* at 6. In short, the policy of self-determination, which is the driving purpose behind the Act, is derived from the same source as the canon of construction favoring Native Americans, i.e., the unique trust relationship between the federal government and Native Americans. We believe it would be entirely inconsistent with the purpose of the Act, as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans to be trumped in this case. We therefore conclude, for purposes of this case, that the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes. *See Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 59 (D.C.Cir.1991) (concluding canon favoring Native Americans is controlling over general rule of deference to agency interpretation); *Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439, 1444–45 (D.C.Cir.1988) (same), *cert. denied* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *but see Haynes v. United States,* 891 F.2d 235, 239 (9th Cir.1989) (declining to apply canon of construction favoring Native Americans "in light of competing deference given to an agency charged with the statute's administration"). The result is that the canon of construction favoring Native Americans necessarily "constrain[s] the possible number of reasonable ways to read an ambiguity in [the] statute." *Commonwealth of Massachusetts v. U.S. Dept. of Transp.,* 93 F.3d 890, 893 (D.C.Cir. 1996).

■ Defendants claim the two subsections at issue simply affirm the method of allocating and funding indirect costs utilized since 1975. More specifically, they assert "[t]he 1988 Amendments to the Self–Determination Act ... show that Congress was keenly aware of the OMB indirect costs system and intended for that methodology to continue to be applied in reimbursing tribal contractors under the Act." Appellees' br. at 15. Accordingly, defendants assert the subsections authorize them to continue to take into account funds received by a tribal organization from other state and/or federal agencies and to allocate the indirect costs "among all contracts." *Id.* at 24–25.

Defendants' interpretation of the Act is unreasonable. Not only does its interpretation not benefit tribes that have chosen to enter into self-determination contracts, it harms them by depriving them of funds necessary to carry out those contracts. Contrary to the entire purpose of the Act, defendants' interpretation of the indirect costs funding provision does nothing to "assure maximum participation by Indian tribes in the planning and administration of federal services, programs and activities for Indian communities," or to "[enhance] the development and perception of Indian tribes as self-government entities." S.Rep. No. 274, 100th Cong., 1st Sess. 1–2.

"The result, then, is that if the [Act] can reasonably be construed as the Tribe would have it construed, it must be construed that way." *Muscogee,* 851 F.2d at 1445. Plaintiff contends the 1988 amendments require full funding of indirect costs and prohibit any adverse adjustments stemming from the failure of other agencies to pay their full share of indirect costs. We conclude this construction is reasonable and consistent with the legislative history accompanying the 1988 amendments. The legislative history indicates one of the primary concerns of Congress in enacting the amendments was the chronic underfunding of tribal indirect costs and the potential this underfunding caused for tribes to retrocede programs back to the federal government. S.Rep. No. 274, 100th Cong., 1st Sess. 8–13. In light of these concerns, we believe there is no basis for concluding Congress intended that the 1988 amendments simply maintain the status quo. Although the Senate Report accompanying the 1988 amendments acknowledges that "[t]he Office of Management and Budget has established guidelines for federal agencies to use to determine indirect cost rates," and that "[t]ribal indirect cost rates are negotiated and approved according to OMB guidelines by the Department of Interior Office of Inspector General," *id.,* there is no indication

in the Report that the Senate intended this system to continue to be applied to self-determination contracts following the 1988 amendments. In fact, subsequent portions of the Senate Report refer to a recommendation from the President's Council on Integrity and Efficiency that .

> the Assistant Secretary for Indian Affairs submit proposals to Congress and the Office of Management and Budget to change the method of reimbursing Indian organizations by (1) removing the legislative and administrative restrictions that affect the reimbursement of indirect costs of Indian organizations, (2) authorizing the Bureau of Indian Affairs to negotiate lump-sum agreements to directly fund all indirect costs relative to Federal contracts and grants, (3) budgeting and providing full funding to the Bureau of Indian Affairs for indirect cost lump-sum agreements, and (4) authorizing Indian organizations to use any unexpended balance (savings) of lump-sum agreements for indirect or direct costs incurred in subsequent years.

*Id.*

We also find significant the fact that Congress specifically directed defendants, with the participation of the tribes, to promulgate new implementing regulations for the 1988 amendments.[7] 25 U.S.C. § 450k(b) (1988). This factor, viewed in light of Congress' obvious dissatisfaction with the pre-amendment method of funding indirect costs, *see* S.Rep. No. 274, 100th Cong., 1st Sess. 8–13 (criticizing "consistent failure of federal agencies to fully fund tribal indirect costs"), leads us to conclude the new subsections were not intended to refer to or otherwise incorporate the pre-amendment formula for computing an indirect costs rate.

We therefore agree with plaintiff that the 1988 amendments to the Act mandate that tribes executing self-determination contracts receive full funding for all reasonable contract support costs associated with self-determination contracts. Although this directive gives defendants discretion to determine which contract support costs are reasonable and necessary to carry out a particular contract,[8] it does not give defendants discretion to deprive a tribe of the full amount of contract support costs which are deemed reasonable and necessary. We further conclude defendants unreasonably interpreted the Act by applying the pre-amendment indirect costs formula to determine the amount of indirect costs funding plaintiff would receive for fiscal year 1989. In applying the pre-amendment formula, defendants included in the direct costs base the funds plaintiff received from the United States Department of Justice (via the State of New Mexico) for criminal justice and juvenile offender restitution programs. Although inclusion of these funds in the direct costs base would have been proper if those programs included funding for their apportioned share of the indirect costs pool, the uncontroverted facts indicate they did not. By including the Department of Justice funds in the direct costs base, defendants effectively and knowingly reduced the amount of funding they would provide to plaintiff to cover the indirect costs pool and thereby deprived plaintiff of full indirect costs funding for fiscal year 1989.

### III.

Because we conclude defendants violated the Act, we reverse the judgment of the district court and remand for further proceedings consistent with this order. In so doing, we find it necessary to briefly

---

7. Such a step would have been arguably unnecessary had Congress intended for defendants to continue to rely on the 1975 regulations concerning funding of indirect costs. In any event, had defendants actually complied with this directive, they could have tested their interpretation of the 1988 amendments by simply presenting to Congress an identical version of their 1975 regulations concerning indirect cost funding. By failing to comply with Congress' directive to promulgate new regulations, defen- dants have essentially helped to create the problem at hand.

8. It is uncontroverted that defendants determine the reasonableness of indirect costs prior to applying the indirect costs formula. *See, e.g.,* R. I at 360 (deposition testimony from OIG employee indicating OIG auditors first determine whether proposed indirect costs are "fair and reasonable" before adding them to the indirect costs pool).

address an argument asserted by defendants. In their appellate brief, defendants complain that abandonment of the indirect costs formula could result in a host of problems, including overpayment of indirect costs. We disagree. In our view, it is entirely conceivable that, with only slight modification, the indirect costs formula could continue to be used in a manner consistent with Congress' directives. Moreover, regardless of whether the formula is modified or abandoned, nothing in the Act entitles a tribe to a windfall or requires defendants to ignore indirect costs funding a tribe receives from other sources (e.g., other state or federal agencies). Rather, the Act simply imposes a duty upon defendants to ensure that a tribe received sufficient funding to cover those reasonable indirect costs necessary to carry out its self-determination contracts.

REVERSED and REMANDED.

